1  Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
   Andrea Soliz (SBN 243302) *as@mckennonlawgroup.com*
2  **McKENNON LAW GROUP PC**
   20321 SW Birch Street, Suite 200
3  Newport Beach, California 92660
   Phone:  949-387-9595; Fax:  949-385-5165
4

5  Attorneys for Plaintiff Kayle Flores

6

7

8                **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

10

| | |
|---|---|
| 11  KAYLE FLORES, | Case No.: |
| 12           Plaintiff, | Action Filed: |
| 13  vs. | Trial Date: |
| 14  LIFE INSURANCE COMPANY OF | |
| 15  NORTH AMERICA, a Pennsylvania corporation; and DOES 1 to 10, | **COMPLAINT FOR BREACH OF INSURANCE CONTRACT AND** |
| 16  inclusive, | **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND** |
| 17           Defendants. | **FAIR DEALING** |
| 18 | **REQUEST FOR JURY TRIAL** |

19

20     [Filed Concurrently With:
       -  Civil Cover Sheet;
21     -  Summons; and
       -  Certification of Interested Parties]
22

23

24

25

26

27

28

## **INTRODUCTION**

1.     This lawsuit is necessary because, when presented with a disability claim by Plaintiff, Kayle Flores ("Plaintiff" or "Ms. Flores") – a registered nurse who reported that symptoms caused by a rare, debilitating medical condition known as Cushing's disease prevented her from performing the substantial duties of her occupation – Defendant Life Insurance Company of North America ("LINA") denied her claim based on a biased, self-serving examination of her medical records that ignored the vast majority of evidence supporting her claim.  The denial decision was improper and in bad faith for multiple reasons.  First, LINA failed to examine Ms. Flores in person, instead relying on cursory "paper reviews" of her medical records by in-house nurse reviewers who did not have the proper training to render opinions regarding Ms. Flores' medical condition.  Second, LINA wrongly determined that the information contained in Ms. Flores' medical file did not support restrictions and limitations.  Finally, the claim investigation and denial decision were arbitrary and capricious and ignored pertinent medical evidence that supported Ms. Flores' disability status.  These and other acts alleged below are evidence that LINA acted in bad faith to deprive Ms. Flores of the disability benefits she needs to financially survive.

## **THE PARTIES**

2.     Ms. Flores is an individual who, at all times relevant, was, and is, a resident of Orange County, California and a citizen of the State of California.

3.     Ms. Flores is informed and believes, and on that basis alleges, that LINA, which operates under Cigna Group Insurance ("CIGNA") is, and at all times relevant was, a Pennsylvania corporation with its principal places of business in

1

1  Philadelphia, Pennsylvania.  Ms. Flores is also informed and believes, and on that

2  basis alleges, that LINA was an insurance company validly licensed to conduct

3  business within the State of California and doing business in Orange County,

4  California as both LINA and CIGNA.

5

6       4.     Defendants Does 1 through 10, inclusive, are sued by fictitious names

7  because their true name and capacities, whether individual, corporate, associate or

8  otherwise, and/or their responsibility and culpability for the acts alleged herein are

9  unknown to Ms. Flores at this time.  Ms. Flores is informed and believes, and on

10  that basis alleges, that each Defendant sued herein as "Doe" is responsible in some

11  manner for the acts and events referred to herein.  When their true names, capacities,

12  responsibility and culpability are ascertained, Ms. Flores will seek leave of this

13  Court to amend the complaint, as appropriate.

14

15       5.     Ms. Flores is informed and believes, and on that basis alleges, that, at

16  all times mentioned herein, each of the fictitiously named defendants was the agent,

17  representative, co-conspirator, successor-in-interest, assignee or employee of each

18  remaining defendant, and in doing the things alleged herein was acting within the

19  course and scope of such agency, representation, conspiracy, assignment or

20  employment.

21

22                      **JURISDICTION AND VENUE**

23

24       6.     This Court has jurisdiction pursuant to 28 U.S.C. Section 1332 because

25  Ms. Flores and LINA are citizens of different states (California and Pennsylvania,

26  respectively) and the amount in controversy exceeds $75,000.

27

28       7.     Venue is proper in this Court because the insurance contract at issue,

and LINA's liability to Ms. Flores, arose in Rancho Santa Margarita, California and Ms. Flores resides there.  In addition, LINA conducted extensive business in California, including Rancho Santa Margarita, during the relevant times.

## **GENERAL FACTS/ALLEGATIONS**

8.     Ms. Flores began working for St. Joseph Health ("St. Joseph") on April 30, 2012.  At the time she became disabled on January 28, 2018, she was employed as a registered nurse.  She has not worked for St. Joseph or any other employer since that date.  As a registered nurse, Ms. Flores worked in the mother-baby unit at St. Joseph.  She was responsible for providing collaborative and comprehensive care based on patient and family needs.  Her job duties included patient assessment, treatment, care, medication administration and discharge.  Her position required mental sharpness, critical thinking, quick intervention and multitasking in order to quickly and accurately address patient needs.  Her job was also physically demanding, requiring continuous monitoring of patients and frequent bending, kneeling, lifting, pushing and pulling.  The *Dictionary of Occupational Titles* ("DOT") categorizes Ms. Flores' occupation as a medium-strength occupation that requires lifting, carrying, pushing and/or pulling 20-50 pounds occasionally, 10-25 pounds frequently and/or up to 10 pounds constantly.

9.     Ms. Flores is, and at all times relevant was, insured under short-term disability ("STD") insurance policy no. VDT-0980119 (the "STD Policy") and long-term disability ("LTD") insurance policy no. FLK-980156 (the "LTD Policy") (collectively, "the Policies").  The Policies were issued by LINA to St. Joseph and provided coverage to eligible employees, which included Ms. Flores.

10.     Pursuant to the terms and conditions of the STD Policy, Ms. Flores is entitled to STD benefits because she met, and continues to meet, the STD Policy's operative "Definition of Disability" and the other conditions necessary to qualify for STD benefits.  The STD Policy defines "Disability/Disabled" in pertinent part as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1.  unable to perform the material duties of his or her Regular Job; and
>
> 2.  unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Job.
>
> The STD policy defines "Regular Job" as follows:
>
> An Employee will be considered Disabled if, because of Injury or Sickness, he is unable to perform the material duties of his regular job.  In evaluating the Disability, the Insurance Company will consider the duties of the job as it is normally performed for the Employer.

11.     Under the terms of the STD Policy, Ms. Flores is entitled to a weekly benefit of $777.50 before reductions for deductible income.[1]  Ms. Flores' STD benefits were payable from February 4, 2018, immediately after the seven-day elimination period, through July 28, 2018.

12.     Pursuant to the terms and conditions of the LTD Policy, Ms. Flores is entitled to LTD benefits because she met, and continues to meet, the LTD Policy's operative "Definition of Disability" and the other conditions necessary to qualify for LTD benefits.  The LTD Policy defines "Disability/Disabled" in pertinent part as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1.  unable to perform the material duties of his or her Regular Occupation; and

---

[1] The STD Policy provides for a disability income benefit of 65% of Ms. Flores' predisability weekly earnings.  Ms. Flores' predisability weekly earnings were $1,196.16.  65% of this amount is $777.50.

4

2.  unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1.  unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and

2.  unable to earn 60% or more of his or her Indexed Earnings.

The LTD policy defines **Regular Occupation** as follows:

The occupation the Employee routinely performs at the time Disability begins.  In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location. [2]

13.     Under the terms of the LTD Policy, Ms. Flores is entitled to a monthly benefit of $2,592 before reductions for deductible income.[3]  Ms. Flores' LTD benefits became payable on July 27, 2018, immediately after the 180-day elimination period.  Given Ms. Flores' age at the time of her disability (she was 36), the maximum benefit period under the LTD Policy is to age 65, or, in Ms. Flores' case, to September 28, 2046.

14.     Ms. Flores has met the Policies' definitions of Total Disability during all relevant periods of time because she suffers from severe symptoms related to Cushing's disease.  She was diagnosed with this disease in November 2017.

---

[2] Under California law, "total disability" means that the insured must be "unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way" and with reasonable continuity.  *See Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1006 (9th Cir. 2004).  "Recovery is not precluded . . . because the insured is able to perform sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of business . . . ." *Id.*; *Erreca v. Western States Life Ins. Co.*, 19 Cal.2d 388, 396 (1942); *see also Hecht v. Paul Revere Life Ins. Co.*, 168 Cal.App.4th 30, 32-33 (2008).
[3] The LTD Policy provides for a disability income benefit of 50% of Ms. Flores' predisability monthly earnings, reduced by deductible income.  Ms. Flores' predisability monthly earnings were $5,183.36.  50% of this amount is $2,591.68.

5

Cushing's disease is a rare, serious condition characterized by an excess of the steroid hormone cortisol in the blood, which is caused by a pituitary tumor that secretes adrenocorticotropic hormone (ACTH). Symptoms of Cushing's disease include: easy bruising of the skin; excessive weight gain; generalized weakness and fatigue; wasting of muscles; menstrual disorders; decreased fertility and/or sex drive; high blood pressure that is often difficult to treat; and mood and behavior disorders.[4] Ms. Flores suffers from all of these symptoms plus a variety of other symptoms, including muscle pain, joint pain, headaches, vertigo, lightheadedness, depression, anxiety, tachycardia, insomnia, brain fog and memory loss. Although Ms. Flores was not diagnosed with Cushing's disease until November 2017, she began experiencing symptoms of this disease since at least August 2016. In addition to Cushing's disease, Ms. Flores also suffers from major depressive disorder, generalized anxiety disorder, attention deficit disorder and iron-deficiency anemia, all of which contribute to her inability to perform her job functions.

15.    Ms. Flores first became unable to work due to her disability on January 28, 2018. She did not immediately file a disability claim with LINA because she was coping with severe symptoms and was unable to focus on completing the necessary paperwork to file a claim. In addition, she underwent brain surgery on April 17, 2018 to remove a tumor in her pituitary gland. As discussed below, despite the surgery, her severe symptoms have persisted, and she remains unable to perform her job functions. She eventually submitted her STD claim to LINA in July 2018.[5] In support of her claim, she submitted a Medical Request Form from her

---

[4] *See http://pituitary.ucla.edu/cushings-disease.*
[5] Although Ms. Flores did not submit a separate LTD claim to LINA, doing so would have been futile because the definitions of "disability" in the STD and LTD Policies are virtually identical, and both policies are administered by LINA and CIGNA. Therefore, and considering LINA'S decision to deny Ms. Flores' STD appeal, LINA clearly would have denied any LTD benefit claim that Ms. Flores submitted for the same reasons that it denied her STD claim. *See Burnett v. Raytheon Co. Short Term Disability Basic Benefit Plan*, 784 F.Supp.2d 1170, 1185
Footnote continues on next page…

1   current primary care physician, Ronald N. Daoud, M.D., dated September 13, 2018,

2   in which he reported Ms. Flores' primary diagnosis as Cushing's disease and listed

3   her restrictions as being unable to sit or stand due to fatigue and headache.  He also

4   noted that Ms. Flores could not return to work even with accommodations.  She also

5   submitted a Medical Request Form from her neurosurgeon, Robert G. Louis, M.D.,

6   dated October 4, 2018, in which he reported that Ms. Flores was unable to work

7   even with accommodations because she was recovering from a craniotomy.  He

8   referred LINA to his medical records for a description of Ms. Flores' symptoms.

9   He estimated that she could return to work on December 31, 2018.  However, as

10  detailed below, Ms. Flores' surgery was not successful at alleviating her symptoms,

11  and she remains unable to work.

12

13          16.      The medical evidence shows that Ms. Flores became disabled on

14  January 28, 2018 and has been continuously disabled since that date.  Ms. Flores has

15  not worked for St. Joseph or any other employer since then.  On October 3, 2017,

16  Ms. Flores sought treatment with endocrinologist Theodore C. Friedman, M.D.  She

17  has treated with Dr. Friedman on at least eight occasions from October 2017 to the

18  present.  At the initial examination, she complained of a multitude of symptoms,

19  including: rash over her face; bumps; itchy skin; muscle fatigue; muscle pain;

20  achiness; skin that feels like it is crawling; achy joints; constant headache; vertigo;

21  insomnia; mental fog; loss of memory; lightheadedness; gastrointestinal upset; facial

22  redness and flushing; blistered lips; acne on her face, cheek, and back; irregular

23  periods; easy bruising; cuts that take excessive time to heal; depression and anxiety;

24  mental fog; excessive thirst; excessive urination; and increased heart rate.  Dr.

25  Friedman suspected that Ms. Flores suffered from Cushing's disease.  He referred

26  ───────────────────

27  (C.D. Cal. Apr. 14, 2011) (Court stating, "To require Burnett to submit a written claim for LTD benefits-which would be subject to a denial similar to that of his STD benefits claim-only then to require him to exhaust his administrative appeals and

28  then possibly return to this Court, would exalt form over substance and defeat the fair and efficient administrative of justice.").

her for extensive testing and confirmed her diagnosis in November 2017. He also determined that she had a tumor on the lower right side of her pituitary gland and recommended that she consult with a neurosurgeon regarding the need for surgical removal of the tumor. Dr. Friedman's office-visit note dated November 22, 2017 – just two months prior to Ms. Flores' disability onset date – indicated that she was feeling much worse and was having trouble taking care of her children and holding down her job.

17.     On February 1, 2018, Ms. Flores treated with her long-standing primary care physician, Dr. Daoud. Ms. Flores has treated with Dr. Daoud on at least 18 occasions from February 2018 to the present. At the February 1 visit, Dr. Daoud noted that Ms. Flores was following up with an endocrinologist and a neurosurgeon for Cushing's disease. He also noted that she had excessive fatigue and had been out of work since the previous Saturday. **He stated that, in his professional opinion, Ms. Flores was unable to participate in any gainful employment secondary to Cushing's disease.** He reiterated this opinion in office notes dated March 2, May 10 and December 6, 2018. At a visit on September 25, 2018 (four weeks prior to LINA's claim denial), Dr. Daoud noted that Ms. Flores continued to suffer from severe symptoms, including jaw cramping, insomnia, excessive fatigue, headaches and inability to lose weight. She was unable to carry out her own activities of daily living and spent most of the day in bed secondary to the muscle fatigue and pain. His assessments of Ms. Flores included Cushing's disease, insomnia, generalized anxiety disorder, major depressive order, fatigue, obesity, restless leg syndrome, attention deficit disorder and constipation.

18.     In the meantime, Ms. Flores was seen by neurosurgeon Dr. Louis. On February 28, 2018, Dr. Louis noted that Ms. Flores was very fatigued and had confusion, memory loss, weight gain and occasional vertigo. He indicated that an

8

MRI conducted on February 19, 2018 showed a microadenoma (a noncancerous tumor that develops on the pituitary gland) and recommended surgical removal of the microadenoma.  On March 23, 2018, Dr. Louis wrote a letter in which he stated that Ms. Flores would be undergoing surgery on April 17, 2018, that her recovery time was estimated at five to six weeks and that she would have restrictions post-operatively.  Ms. Flores underwent the recommended surgery on April 17, 2018.  She was seen by Dr. Louis for follow-up visits on April 23 and June 11.  On June 25, 2018, Dr. Louis wrote another letter in which he indicated that Ms. Flores had undergone extensive surgery on April 17 and that her recovery was taking longer than originally anticipated.  He stated that she would require assistance for another three months.  On September 12, 2018, Ms. Flores presented for another follow-up visit with Dr. Louis in which she complained of insomnia, fatigue, weakness, frequent urination, memory loss and body aches.  Dr. Louis noted that she was five months post-operation from tumor removal and that her Cushing's symptoms were returning.  He confirmed her diagnosis of Cushing's disease and recommended a follow-up in two months.

19.     On September 29, 2018, Ms. Flores returned to Dr. Friedman.  Dr. Friedman noted that the April surgery had gone well, but that by the end of June 2018, Ms. Flores' Cushing's symptoms had returned.  She was again having trouble sleeping, weight gain, irregular menstrual periods and fatigue.  Dr. Friedman reported that her laboratory data had revealed elevated cortisol, which is indicative of Cushing's disease.  He recommended further testing.  Ms. Flores was seen by Dr. Friedman again on October 28, 2018, at which time she reported that she did not feel cured.  Dr. Friedman noted that he had reviewed her most recent pituitary MRI and, although it was read as normal, he saw an abnormal area on the upper left side of her pituitary gland.  He stated that he was concerned about this area and wished to review it with Dr. Louis and get another MRI in three months.  On March 16,

2019, Ms. Flores had a telephone appointment with Dr. Friedman.  She reported that, although she had experienced some improvement in her symptoms, she had been feeling worse since January.  Dr. Friedman reported that her laboratory testing had revealed normal to slightly elevated cortisol, but he noted that, because she was doing her testing on Ambien, this may have lowered her cortisol results.  He stated again that he was concerned about the possibility of a tumor on the left side of her pituitary gland, but that the MRI scans were "not the best."  He recommended that she continue with medication treatment unless there was a more clear-cut tumor.  He concluded his report by stating that he understood that Ms. Flores had been unable to carry out her functions as a nurse due to her Cushing's disease and that it would be reasonable for her to have some level of disability until she has a more definitive cure.

20.    On November 5, 2019, Ms. Flores underwent a diagnostic venogram of the brain and an inferior petrosal sinus sampling procedure at UCI Medical Center that confirmed ACTH (pituitary) dependent Cushing's disease.

21.    Ms. Flores returned to Dr. Friedman on December 1, 2019.  At that time, she reported that she still had a low quality of life, could not complete her daily activities, could not take care of her children and had poor focus and concentration.  Dr. Friedman noted that her laboratory testing showed elevated cortisol.  He also stated that he believed that she had a tumor on the left side of her pituitary gland, based on his reading of her MRI.  He recommended that Dr. Louis review her MRI, and if he also saw a tumor, then Dr. Friedman would recommend proceeding with a second surgery.

22.    Throughout this time, Ms. Flores continued to treat with her primary care physician, Dr. Daoud.  She was seen by Dr. Daoud on January 11, February 19,

10

March 28, May 28, July 16, October 18 and October 31, 2019 and February 11, 2020.  At the February 2019 appointment, Ms. Flores reported that she was having brain fog to the point that when she talked to her son she would later be unable to remember the conversation.  She stated that her memory loss and fatigue continued to worsen and that she was unable to sit for more than 15 minutes at a time.  Dr. Daoud stated that, in his professional opinion, Ms. Flores was completely disabled at that time.  He reiterated this opinion at the March and July 2019 appointments, stating, **"In my professional opinion, patient cannot participate in any gainful employment."**  At the July 2019 visit, he stated that Ms. Flores had developed anxiety, depression, cognitive impairment and fatigue.  At the most recent visit, on February 11, 2020, he noted that Ms. Flores was continuing to follow up with her neurosurgeon regarding the need for a second surgery.  In his assessment, Ms. Flores' diagnoses included Cushing's disease, chest pain, hypertension, obesity, generalized anxiety disorder, insomnia, iron-deficiency anemia, attention deficit disorder and constipation.

23.     At the recommendation of Dr. Daoud, Ms. Flores underwent a neuropsychological evaluation with Haygoush Kalinian, Ph.D. to assess her cognitive function.  Dr. Kalinian's report, dated July 3, 2019, revealed that Ms. Flores had neuropsychological deficits in the following areas: complex auditory and visual attention and working memory; delayed memory for daily living; and moderate anxiety and severe depression.  Dr. Kalinian concluded that Ms. Flores' cognitive function was likely being impacted by a mood disorder and that the testing did not demonstrate a neurocognitive or neurological disorder.

24.     As part of its claims-review process, on October 9, 2018, LINA representative Terri Kehoe spoke with Ms. Flores by telephone to discuss her functioning.  During the telephone call, Ms. Flores stated that she had profound

weakness and insomnia, plus a high heart rate upon extended activity, and that she was always exhausted and unable to function during the day due to brain fog.  She stated that her daily activities included dropping her children off at school and then going back to bed when she got home.  She explained that she could not take care of her children and thus she had someone come to watch them and keep them safe.  She stated that she felt worn down all the time.  In response to Ms. Kehoe's question of what job duties would be difficult to complete, Ms. Flores stated that her job required a lot of critical thinking, and she had to be "quick on her feet" because she was involved in patient care and medication administration and she had a physically demanding job.

25.     On this same day – October 9, 2018 – LINA's nurse case manager, Andrea Dorman, spoke with Dr. Louis' office.  Dr. Louis' office manager, Jessica, informed Nurse Dorman that Ms. Flores was suffering from post-operative complications, that her pituitary function had not returned to normal and that Dr. Louis' current recommended return-to-work date was December 31, 2018.

26.     On October 15, 2018, Dr. Daoud responded to a letter sent to him by Nurse Dorman that requested clarification regarding Ms. Flores' level of function.  In his response, Dr. Daoud stated that (1) Ms. Flores' restrictions were that she could not sit or stand for more than 15 minutes at a time and she could not concentrate, and (2) the clinical findings included a pituitary tumor.  He also stated that Ms. Flores experienced excessive fatigue and inability to concentrate and that she might need another surgery.  He reported that Ms. Flores' diagnostic testing had revealed Cushing's disease and that her anticipated return-to-work date was January 15, 2019.  Of course, as detailed herein, Ms. Flores was not able to return to work by January 2019, and Dr. Daoud continued to recommend that she remain off work past that date.

27.    On March 27, 2019, Dr. Daoud wrote a letter in support of Ms. Flores' disability claim, which Ms. Flores provided to LINA.  In the letter, he firmly advocated for Ms. Flores' continued disability.  He stated that, in his frequent examinations of Ms. Flores, she was extraordinarily fatigued, had muscle weakness, depression, anxiety, unprovoked tachycardia while sitting or standing, nightly insomnia, brain fog and memory loss and medications to treat these symptoms had been futile.  He noted that Ms. Flores worked as a registered nurse at St. Joseph, where she had responsibility for multiple patients during her 12-hour shifts.  He stated that Ms. Flores' condition caused her to struggle to remember tasks to be completed at her job and that this was threatening the safety of her patients.  He said that Ms. Flores had informed him that often while working she felt as if she were about to faint just from walking down the hall.  Dr. Daoud explained that Cushing's disease is a very serious and deadly illness that causes a multitude of co-morbidities that can increase with the added stress from one's job.  **He stated that Ms. Flores was not fit to perform the functions of her job or any job that requires cognitive reasoning, physical endurance or any mental stability and that Ms. Flores continued to struggle with all of the above symptoms because the surgery did not put her into a permanent remission.**

28.    Ms. Flores' symptoms make it impossible for her to adequately and safely perform her job duties.  Just prior to her disability, due to brain fog and memory loss, she was having difficulty communicating with patients and remembering critical tasks to be completed such as administering medication.  She could not concentrate on her work tasks because of her pain, lightheadedness, brain fog and fatigue.  She also felt physically drained; simple tasks such as walking down the hall or out of the elevator to the breakroom would leave her short of breath, dizzy and sweating.  Her severe symptoms made her unable to meet the difficult mental and physical challenges of her occupation.

13

29.     Currently, Ms. Flores is in the process of being evaluated for a second brain surgery.  She is continuing to follow up with her providers and will proceed with her doctors' treatment recommendations.  Given the foregoing circumstances, it is without dispute that Ms. Flores was and is disabled from performing the duties of her own occupation, or any occupation, due to her Cushing's disease.  This condition causes severe symptoms, including fatigue, headaches, brain fog and muscle pain and weakness.  Her restrictions and limitations are supported, not only by her treating physicians' medical reports and opinions and her own subjective reports of symptoms, but by multiple objective tests, including various MRI scans and lab results.

30.     Despite the convincing evidence supporting Ms. Flores' claim, on October 23, 2018, LINA informed Ms. Flores that her STD claim was being denied because LINA believed (incorrectly) that the medical information on file did not support her disability.  After a cursory paper review by its in-house clinicians, Nurse Andrea Dorman and Nurse Christine Fletcher, LINA concluded that it was not able to support functional impairment based on the information it had received.  In reaching its decision, LINA improperly focused on cherry-picked statements in the medical records that could be deemed supportive of denial.  For instance, LINA noted that Dr. Daoud's physical exams documented no extremity edema, no calf tenderness, no motor deficits, good pulses and normal reflexes.  None of these issues have any bearing on Ms. Flores' disability, as her disability is based on her diagnosis of Cushing's disease and this disease does not involve calf tenderness, extremity edema or abnormal reflexes.  LINA and its clinicians dismissed Ms. Flores' subjective complaints of severe fatigue, brain fog, difficulty concentrating and muscle weakness, among others, and completely ignored Dr. Daoud's office-visit notes from February 1, March 2 and May 10, 2018, in which he stated that Ms. Flores was unable to participate in any gainful employment secondary to Cushing's

14

disease.  LINA and its clinicians also disregarded the objective evidence that supports her condition, including various MRIs and lab testing.  These records clearly showed that Ms. Flores' condition had persisted since January 2018 and that she was suffering from a multitude of symptoms, which made her unable to perform the duties of any occupation.

31.     On October 26, 2018, Ms. Flores notified LINA via email that she intended to appeal the decision.  She later submitted updated medical records from Dr. Daoud in support of her appeal.  Based on the records provided by Ms. Flores that confirmed her diagnosed disabilities and related restrictions and limitations as discussed above, LINA should have reversed its claim denial.  However, in considering her appeal, instead of approving her claim, or even having Ms. Flores appear for an independent medical examination, LINA again referred her file to an unqualified in-house nurse case manager, Rima Aivazian.  Nurse Aivazian concluded, without having examined or spoken to Ms. Flores, that the medical information did not support functional impairment from Ms. Flores' initial disability date to her surgery date.  In reaching her conclusion, Nurse Aivazian focused on the lack of clinical exam findings and lack of focal motor, neurological, sensory, circulatory or psychological deficits.  Again, none of these issues has any bearing on Ms. Flores' disability, which is based on her diagnosis of Cushing's disease.  Nurse Aivazian completely ignored the clinical evidence that shows that Ms. Flores suffers from Cushing's disease and the medical records that documented her long list of symptoms that made it impossible for her to work in any gainful employment.  Of note, Nurse Aivazian did find that the medical evidence demonstrated functional impairment from the April 17, 2018 surgery date through June 11, 2018.  Importantly, she never concluded that Ms. Flores was able to return to full-time work after June 11.

15

32.     By letter dated January 29, 2019, LINA informed Ms. Flores that it upheld the denial of her claim, based on Nurse Aivazian's assessment.  LINA acknowledged that functional impairment was supported from April 17 to June 11, 2018, but stated that, because her claim was not continuously supported from her initial disability date in January 2018, the prior denial decision would remain unchanged.  The letter gave Ms. Flores an opportunity to submit a response to the decision.  Ms. Flores submitted additional medical evidence in March 2019.  This consisted of Dr. Daoud's March 27, 2019 letter and Dr. Louis' letters dated March 23 and June 25, 2018.  LINA submitted these letters, for further review, to Nurse Aivazian, who summarily concluded that they did not change her prior opinion. Nurse Aivazian focused on the lack of physical exam findings and disregarded the extensive list of symptoms noted in Dr. Daoud's March 27, 2019 letter, as well as his statement that Ms. Flores could not safely perform her job duties due to her condition.  Nurse Aivazian also based her conclusion on the fact that Dr. Louis' March 23, 2018 letter placed restrictions on Ms. Flores after her surgery but not before it.  Because Ms. Flores was claiming an ongoing disability beginning in January 2018, Dr. Louis' letter supported her claim for at least the time period following the surgery.  Nurse Aivazian seemed to ignore this fact and focused only on Ms. Flores' functionality from January 2018 through her surgery date.

33.     On April 11, 2019, LINA again informed Ms. Flores that it had determined that an adverse benefit decision was warranted and that LINA would give her an opportunity to submit a reply to LINA's conclusion.  In response, Ms. Flores submitted medical records from Dr. Friedman dated October 2017 through March 2019.  LINA submitted these records to Nurse Aivazian, who again summarily concluded that they did not change her prior opinion.  Her entire analysis stated as follows: "The above do not change prior recommendation for period under review as evidenced by the pertinent information are lab work which do not address

16

functionality." Nurse Aivazian's statement that the information consisted merely of lab work is incorrect. Ms. Flores submitted Dr. Friedman's office-visit notes from October 3, 2017 through March 16, 2019. As discussed above, Dr. Friedman's records documented Ms. Flores' severe symptoms that interfered with her daily life and prevented her from being able to perform her job duties. They also confirmed Ms. Flores' Cushing's disease diagnosis and documented Dr. Friedman's concerns that she had a second tumor that might require surgical intervention. Furthermore, his March 16, 2019 office note stated that Ms. Flores had been unable to carry out her functions as a nurse due to her Cushing's disease and that it would be reasonable for her to have some level of disability status until she has a more definitive cure. At every stage of her review, Nurse Aivazian ignored key evidence, while improperly focusing on cherry-picked statements in the records to bolster her incorrect conclusions. Furthermore, she failed to provide any explanation as to why her conclusions differed from those of the physicians who had examined and treated Ms. Flores for years. Her opinions were simply offered in a conclusory fashion.

34. On July 17, 2019, LINA again informed Ms. Flores via letter that it intended to deny her appeal and that she had until August 15, 2019 to submit additional evidence. As in the previous two letters, LINA failed to explain to Ms. Flores specifically what evidence was needed to obtain approval of her claim. Ms. Flores had even reached out to LINA's claim representative via email on March 12, 2019, as reflected in LINA's claim notes, to inquire what type of supporting documentation LINA required in order to find functional impairment. LINA's claim representative offered a vague response, stating that records from Ms. Flores' physicians that provided clinical evidence supporting their decision to keep her from work would be most helpful. LINA's representative did not explain what specific clinical evidence was needed. Having already submitted a plethora of medical

1  records that clearly documented her disabling condition and restrictions, Ms. Flores

2  did not submit further information after the July 17, 2019 letter.

3

4       35.    Despite the substantial medical evidence supporting Ms. Flores'

5  disability, including the medical records and opinion of her treating physician (Dr.

6  Daoud), LINA deferred to the opinion of its paper reviewer and upheld the denial of

7  Ms. Flores' STD benefits by letter dated August 19, 2019.  In its cursory denial

8  letter, LINA informed Ms. Flores that restrictions and limitations were not

9  supported from the first date of disability until the date of surgery, that impairment

10  *was* supported from April 17, 2018 through June 11, 2018, but that, following that

11  time period, she was found to be in clinical remission with unremarkable physical

12  examinations.  In its denial letter, LINA addressed only Dr. Friedman's records and

13  failed to address any of the other medical evidence submitted in support of Ms.

14  Flores' appeal, including Dr. Daoud's March 27, 2019 letter in which he firmly

15  advocated for Ms. Flores' continued disability.  Although Dr. Daoud's updated

16  records were addressed in LINA's previous letters to Ms. Flores on January 29 and

17  April 11, 2019, LINA failed to include any discussion or analysis of those records in

18  its final denial letter dated August 19, 2019.  LINA concluded its denial letter by

19  stating that its prior decision was unchanged and that her STD claim would remain

20  closed with no benefits payable.  To reach this conclusion, LINA ignored and

21  disingenuously disregarded pertinent evidence that supported Ms. Flores' ongoing

22  disability.  This evidence included Drs. Daoud's, Louis' and Friedman's medical

23  records that documented Ms. Flores' consistent complaints of fatigue, weakness,

24  muscle aches, brain fog, difficulty concentrating and insomnia, Dr. Daoud's letter in

25  support of Ms. Flores' disability, the Medical Request Forms submitted to LINA

26  and the objective testing that confirmed her diagnosis of Cushing's disease.  In

27  reaching its denial, LINA failed to address the majority of this evidence and instead

28  relied on the biased, conclusory opinion of its in-house nurse case manager.

36.     Furthermore, given the rare and complex nature of Ms. Flores' condition, LINA should have hired an appropriately credentialed physician to review the medical records or conduct an independent medical examination of Ms. Flores, instead of relying on an unqualified nurse case manager.  Also, LINA and its consultants failed to consider how Ms. Flores' fatigue, weakness, brain fog, depression and related symptoms interfered with her ability to perform the mental/cognitive demands of her job.  Ms. Flores' job involved quick thinking and a high degree of concentration in order to adequately and safely care for patients.  LINA and its consultants failed to properly consider whether her condition prevented her from meeting the challenging mental demands of her job and, instead, they focused primarily on whether Ms. Flores was restricted from a physical standpoint.  LINA's failure to refer Ms. Flores' claim file to an appropriate specialist and its failure to consider the full scope of her job duties evidences its arbitrary and capricious handling of her claim.  Despite the substantial medical evidence supporting Ms. Flores' disability, including statements from her long-standing primary care doctor that she was completely disabled and unable to participate in any gainful employment, LINA erroneously and in bad faith denied her claim for disability benefits.

37.     As detailed above, the medical evidence clearly establishes that Ms. Flores was and remains disabled from performing the duties of her own occupation, or any occupation, from January 2018 onward.  Instead of accepting the medical records and opinion of her treating physicians, who examined her in person on numerous occasions and who certified her disability, LINA relied on the opinions of its biased medical consultants, Nurse Dorman, Nurse Fletcher and Nurse Aivazian. Their opinions are less credible than those of the highly qualified treating physicians who examined Ms. Flores in person and treated her on numerous occasions for two years and who, therefore, are far better suited to render credible opinions.

38.     There are many problems with the conclusions of LINA's medical consultants and thus with LINA's benefits decision that is based on them.  First, Nurses Dorman, Fletcher and Aivazian are on-site clinicians **employed directly by LINA** to render disability opinions.  LINA has used these paper reviewers many times with the expectation that they would favor LINA in rendering opinions that LINA can rely upon to deny claims.  The Supreme Court has recognized that a fiduciary, such as LINA, uses medical reviewers on a regular basis and has noted the concern that the reviewers may be motivated to render opinions in favor of the insurer.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 155 L.Ed.2d 1034 (2003).

39.     Second, Nurses Dorman, Fletcher and Aivazian are not as qualified as Ms. Flores' treating physicians to give credible opinions about her medical condition.  They have no specialized training in internal medicine or endocrinology and, therefore, do not have the proper expertise to give credible opinions regarding Ms. Flores' disability, which is based on Cushing's disease.

40.     Third, Nurses Dorman, Fletcher and Aivazian failed to examine Ms. Flores, even though the Policies permitted it.  Therefore, their opinions, based purely on a "cold file review" of Ms. Flores' medical records, carry far less weight than do the opinions of Ms. Flores' treating primary care provider, Dr. Daoud, who regularly examined her in person for several years and consequently gained great insight into her work limits.  Nurses Dorman, Fletcher and Aivazian simply do not have the benefit of the insight gained through personal observation.  Furthermore, LINA's failure to have Ms. Flores examined by a physician consultant raises questions about the credibility of its nurse reviewers' opinions and therefore the thoroughness and accuracy of LINA's benefits decision.

41.     Fourth, as discussed above, LINA's medical consultants' reports are vague and conclusory and improperly focused on cherry-picked statements from the medical records, while disregarding pertinent evidence that supported Ms. Flores' disability, including her subjective complaints of fatigue, weakness, brain fog, muscle pain and insomnia.  The medical record in this case, as summarized above, is replete with consistent reports of Ms. Flores' ongoing complaints of fatigue, weakness, brain fog, muscle pain, insomnia, and numerous other ailments, which render her unable to concentrate on work tasks and meet the physical and mental demands of her job.  The complaints are corroborated by objective testing, disability questionnaires and her treating physician's medical records and disability certification letter.  Nurses Dorman, Fletcher and Aivazian improperly ignored this evidence and presented their opinions in a conclusory fashion, making it unclear why they believe that Ms. Flores was not continually disabled from January 2018 onward, when she continues to suffer from debilitating symptoms that make it impossible for her to sit for more than 15 minutes at a time or carry out her activities of daily living.  To reach their conclusions, they de-emphasized and/or simply ignored documentation consistent with Ms. Flores' total disability.  However, they provided no explanation as to how they reached their incorrect conclusions based on the medical records, which include the contradictory conclusions reached by the treating primary care doctor (Dr. Daoud) who actually examined Ms. Flores.  In addition, Nurse Aivazian's report does not support LINA's blanket claim denial because she specifically found that impairment *was* supported for a two-month period following Ms. Flores' surgery, and she never concluded that Ms. Flores was able to engage in full-time work beyond June 11, 2018.  Therefore, it was improper for LINA to rely on her report to support its claim denial.

42.     That LINA's medical consultants improperly cherry-picked information from the record is evidenced by the fact that all of the information to

21

which they cite in their reviews are statements or exams that are normal or unremarkable – they do not focus on any of Ms. Flores' abnormal or remarkable findings.  For instance, Nurses Dorman and Fletcher noted that Dr. Daoud's physical exams documented no extremity edema, no calf tenderness, no motor deficits, good pulses and normal reflexes and Nurse Aivazian focused on the lack of clinical exam findings and lack of focal motor, neurological, sensory, circulatory or psychological deficits.  LINA's nurse reviewers completely disregarded Ms. Flores' subjective complaints of severe fatigue, brain fog, difficulty concentrating and muscle weakness, among others, and completely ignored Dr. Daoud's office visit notes from February 1, March 2 and May 10, 2018, in which he stated that Ms. Flores was unable to participate in any gainful employment secondary to Cushing's disease.  LINA's clinicians also disregarded the objective evidence that supports her condition, including various MRIs and lab testing.  These records clearly showed that Ms. Flores' condition had persisted since January 2018 and that she was suffering from a multitude of symptoms, which made her unable to perform the duties of any occupation.  In addition, Nurse Aivazian disregarded the extensive list of symptoms noted in Dr. Daoud's March 27, 2019 letter, as well as his statement that Ms. Flores could not safely perform her job duties due to her condition.  Further, the nurses ignored the conclusions in the neuropsychological evaluation conducted by Dr. Kalinian in which she stated that Ms. Flores had neuropsychological deficits in the following areas: complex auditory and visual attention and working memory; delayed memory for daily living; and moderate anxiety and severe depression and that Ms. Flores' cognitive function was likely being impacted by a mood disorder.

43.     Given that Ms. Flores' treating physician's opinions and Dr. Kalinian's opinions were based on multiple in-person examinations, testing, and on reviews of

22

objective diagnostic reports (including lab tests and MRI reports), LINA had no basis on which to deny her claim for disability benefits.

44.    Furthermore, by highlighting statements in the claim file that support a denial of Ms. Flores' claim (such as normal physical exam findings and lack of sensory deficits) while ignoring pertinent evidence to the contrary, both LINA and its consultants engaged in an arbitrary and biased handling of Ms. Flores' file. That is improper under the law and establishes that LINA's decision is incorrect. *See Winkler v. Metro. Life Ins. Co.*, 170 F.App'x 167, 168 (2nd Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence, but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary.").[6]

45.    Here, the weight of the evidence that existed when LINA denied the claim clearly favored a finding that Ms. Flores was disabled due to her diagnosis of Cushing's disease. LINA's reliance on its deficient paper-review reports to deny the claim amounts to bad faith, especially because Ms. Flores' treating physicians, who examined her in person on multiple occasions, found her to be disabled. Moreover, a biased investigation occurs when an insurer dishonestly selects its experts or where the insurer's experts act unreasonably. *See Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir. 2001).

46.    Ms. Flores is now, and at all times relevant has remained, "Totally Disabled" as defined in the Policies, and has now and at all times relevant

---

[6] *Winkler* is an ERISA case, but is nonetheless persuasive because the court found that the similar conduct was arbitrary, capricious and unreasonable and that it abused the insurer's discretion to fairly decide the claim.

convincingly demonstrated her total disability through medical records and other documents, information and correspondence.

47.     Accordingly, a dispute exists between Ms. Flores and LINA regarding her entitlement to STD and LTD benefits from February 4, 2018 forward.

## FIRST CLAIM FOR RELIEF

For Breach of Contract

(Ms. Flores Against LINA and Does 1 to 10)

48.     Ms. Flores incorporates by reference each and every allegation set forth in each of the foregoing paragraphs, as though fully set forth herein.

49.     Ms. Flores and LINA entered into a valid and binding written contract, i.e., the Policies, by virtue of Ms. Flores being an insured under those certain group insurance policies issued by LINA to her employer.  The Policies obligated LINA to, among other things, pay Ms. Flores disability benefits should she become totally disabled within the meaning of the Policies.

50.     At all times relevant, Ms. Flores has been, and continues to be, totally disabled within the meaning of the Policies.

51.     LINA improperly, unreasonably, incorrectly and with willful disregard denied Ms. Flores' claim for disability benefits that were and are due and owing to her under the Policies.

52.     Ms. Flores fulfilled every condition and has duly performed each and every obligation she was required to perform under the terms of the Policies, and is,

24

and at all times relevant has been, entitled to payment of STD and LTD benefits under the terms and conditions of the Policies.

53.     LINA breached its obligations to Ms. Flores by failing to fulfill its obligations under the Policies, including but not limited to the obligation to pay her disability benefits, and by ignoring the ample medical evidence in support of her disability claim and ignoring its obligation to conduct a thorough claims examination.

54.     As a direct and proximate result of LINA's conduct as alleged herein, Ms. Flores has suffered and will continue to suffer monetary and non-monetary damages, in an amount to be determined at trial, but which exceeds $75,000, including but not limited to loss of her disability insurance benefits and pre-judgment interest on those benefits.

55.     Ms. Flores alleges all of the same conduct against Defendants Does 1 through 10 as it does against LINA in this First Claim for Relief and in this Complaint.

## SECOND CLAIM FOR RELIEF

For Breach of the Implied Covenant of Good Faith and Fair Dealing

(Ms. Flores Against LINA and Does 1 to 10)

56.     Ms. Flores incorporates by reference each and every allegation set forth in each of the foregoing paragraphs, as though fully set forth herein.

57.     LINA's denial of Ms. Flores' claim for payment of disability insurance benefits was unreasonable and without proper cause.

25

58.     No reasonable dispute exists that Ms. Flores' medical condition prevents her from returning to work in her prior occupation.  However, rather than reviewing her medical records and reaching the proper conclusion that Ms. Flores cannot perform the duties of her own occupation — an opinion expressed by multiple physicians who actually examined Ms. Flores — LINA decided to deny her claim for disability benefits without proper cause and in bad faith.

59.     Each and every agreement in California, including the Policies, contains an implied covenant of good faith and fair dealing.  *See Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809 (1979).  That covenant required LINA to, among other things: refrain from acting in any way that could unreasonably jeopardize, impair or interfere with the rights of Ms. Flores to receive the benefits of the contract, including her disability benefits; properly investigate the claim; not withhold or delay paying Policy benefits unreasonably or without proper cause; act reasonably in handling, processing and paying the claim when considering the totality of the circumstances; and give at least as much consideration to the insured's interests as it does to its own.  LINA violated this covenant when it improperly and unreasonably denied Ms. Flores' claim for benefits from February 4, 2018 to the present.

60.     LINA violated and breached this implied covenant and breached its duty of good faith and fair dealing owed to Ms. Flores by the following, among other, conduct:

(a)     Unreasonable and bad-faith failure to approve and pay Ms. Flores the benefits she was due under the Policies.  LINA paid her nothing and unreasonably denied the claims in full;

(b)     Unreasonable and bad-faith failure to investigate Ms. Flores' entitlement to payment of the submitted claim.  A claim

26

investigation must thoroughly investigate all the possible bases that might support an insured's claim, and a trier of fact may find that an insurer acted unreasonably if it ignored evidence available that supports the claim.  *Wilson v. 21st Century Ins. Co.,* 42 Cal.4th 713, 721 (2007); *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.,* 78 Cal.App.4th 847, 879-80 (2000) (The adequacy of an insurer's investigation is one of the most critical factors in determining whether an insurer acted in good faith.);

(c)    Failing to conduct a thorough investigation and thus breaching the implied covenant (*see Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir. 2001)), as evidenced by the above-described conduct and also because it: (1) failed to consult with medical experts as was appropriate in this case, instead unreasonably opting to rely on purely "paper-reviewing" medical consultants (*see Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 724 (2007) and *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1624-1625 (1996) (failure to consult with the insurer's own doctor or treating physician)); and (2) failed to investigate beyond the facts and coverage theories asserted by the insured (*see Jordan v. Allstate Ins. Co.*, 148 Cal.App.4th 1062, 1072 (2007) (An insurer must "fully inquire into possible bases that might support the insured's claim.")), among other things;

(d)    Inadequate communication with Ms. Flores regarding what information was needed to support the claim.  *See Delgado v. Heritage Life Ins. Co.*, 157 Cal.App.3d 262, 278 (1984);

(e)    Conducting a biased claims examination and investigation, using biased claims examiners, supervisors and medical reviewers, all of whom conducted a cursory examination of the medical documents. *See Barbour v. UNUM Life Ins. Co.*, 2011 U.S. Dist. LEXIS 91060 (S.D. Cal. 2011) (Reliance on in-house experts' analysis and failure to view the evidence in the light most favorable to the insured were determined to constitute potentially unreasonable claims handling and cannot create a "genuine dispute" as to coverage sufficient to absolve the insurer of bad-faith liability);

(f)    Conducting a biased claims examination and investigation by improperly focusing on cherry-picked statements in the medical records that could be deemed supportive of denial, ignoring evidence that supported the claim, and failing to utilize objective

standards in making its claims decisions.  *See Wilson, supra*, 42 Cal. 4th at 724;[7]

(g)   Conducting purely "paper reviews" of Plaintiff's medical records instead of having an independent medical examination done, *see Phillips v. Clark County School District*, 2012 U.S. Dist. LEXIS 141633, 2012 WL 4604466 (D. Nev. Sept. 30, 2012) (An insurance provider's act in conducting a "pure paper" review, rather than an independent medical examination, constitutes "an indicator of bias.");

(h)   Insisting on "objective findings" proving disability and, therefore, terminated Plaintiff's disability benefits because none existed.  But "objective" evidence of mental illness is not even feasible to provide under well-established case law and medical standards;

(i)   Unreasonable and bad-faith failure to use experts to who had adequate education, training and experience to render a competent opinions about Ms. Flores' medical conditions and restrictions and limitations;

(j)   Failing to consider and apply the proper standard of disability under California law and ignoring the credible objective and subjective evidence of Ms. Flores' disability that rendered her unable to perform the substantial and material acts necessary to the prosecution of her business or occupation in the usual or customary way and with reasonable continuity.  *See Hangarter, supra*, 373 F.3d at 1006;

(k)   Violating many provisions of the Unfair Claims Settlement Practices Act (*see* California Insurance Code Section 790.03(h)) and the corresponding California Fair Claims Settlement Practices regulations (*see* 10 Cal. Code Regs. Section 2695.1 *et seq.*), which is further evidence that it breached the implied covenant. *See Jordan*, 148 Cal.App.4th at 1078 ("This is a *proper* use of evidence of an insurer's violations of the statute and the corresponding regulations.") (italics in original); and

---

[7] *See also Hughes v. Blue Cross of No. Calif.*, 215 Cal. App. 3d 832, 845-846 (1989) (Denial of health insurance claim on the ground hospitalization was not "medically necessary."  Insurer relied exclusively on a consultant who had not investigated the claim thoroughly and ignored opinions given by other doctors.  Insurer's standard of "medical necessity" held "sufficiently at variance with community medical standards to constitute bad faith.")

28

(l)   Unreasonable and bad-faith failure to give at least as much consideration to Plaintiff's interests as it did to its own interests. *See Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 818 (1979).

61.    LINA's malicious and unreasonable conduct caused Ms. Flores to suffer emotional and financial distress.  She could not work to help support herself or her family, and the improper denial of disability benefits placed a great financial stress on her.  LINA cut off Ms. Flores' financial lifeline and unreasonably told her that she could and should return to work.  LINA unreasonably denied her claim in order to protect its own financial interests at the expense of Ms. Flores' interests when she needed the money to support herself and her family, causing her worry, anxiety, mental anguish and serious emotional suffering and distress.

62.    By refusing to provide Ms. Flores the benefits to which she is entitled, and to which she relies on to live, LINA has also caused Ms. Flores to suffer financial damages.

63.    As a proximate result of LINA's unreasonable claims handling and decision to deny her claim for disability benefits, Ms. Flores had to retain lawyers to represent her.  She has incurred attorneys' fees and costs, and will continue to do so, to file this litigation and otherwise pursue the disability benefits she is entitled to receive from LINA under the Policies, but which LINA has unreasonably refused to provide.

64.    LINA's conduct, as alleged above, was undertaken with a malicious intent of depriving Ms. Flores of her legal right to disability insurance proceeds that were and are due under the Policies and otherwise causing her injury.  The acts were despicable, malicious, oppressive and/or fraudulent and subjected Ms. Flores to a

cruel and unjust hardship in conscious disregard of her rights, which justifies an award of exemplary and punitive damages in an amount to be proven at trial.

65.     LINA's officers, directors and/or managing agents were either personally involved in the reprehensible conduct that warrants punitive damages, and/or they authorized or ratified this conduct of its employees.

66.     As a direct and proximate result of LINA's conduct as alleged herein, Ms. Flores has suffered and will continue to suffer monetary and non-monetary damages, in an amount to be determined at trial, but which exceed $75,000, including but not limited to loss of her disability insurance benefits, pre-judgment interest on those benefits at the legal rate, consequential damages, emotional-distress damages and attorneys' fees, costs and expenses incurred in pursuing the Policies' benefits, under *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985) and its progeny.

67.     Ms. Flores alleges all of the same conduct against Defendants Does 1 through 10 as it does against LINA in this Second Claim for Relief and in this Complaint.

## **PRAYER**

WHEREFORE, Ms. Flores prays for judgment as follows:

1.  For past and future benefits due under the Policies.
2.  For compensatory and consequential damages.
3.  For emotional distress damages.
4.  For punitive damages.
5.  For pre-judgment and post-judgment interest.
6.  For attorneys' fees and costs of suit.

1

      7.  For such other and further relief as the Court deems just and proper.

2

3    Dated:  May 13, 2020                              McKENNON LAW GROUP PC

4

5                                            By: _____

6                                                ROBERT J. McKENNON
                                                 ANDREA SOLIZ
7                                                Attorneys for Kayle Flores

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **REQUEST FOR JURY TRIAL**

Plaintiff requests a trial by jury.

Dated:  May 13, 2020                    McKENNON LAW GROUP PC

By:  _____
                                        ROBERT J. McKENNON
                                        ANDREA SOLIZ
                                        Attorneys for Kayle Flores

32